# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 9, 2012          Decided June 26, 2012

No. 11-1168

VERMONT DEPARTMENT OF PUBLIC SERVICE ET AL.,
PETITIONER

v.

UNITED STATES OF AMERICA
AND NUCLEAR REGULATORY COMMISSION,
RESPONDENTS

ENTERGY NUCLEAR OPERATIONS, INC.
AND ENTERGY NUCLEAR VERMONT YANKEE, LLC,
INTERVENORS

---

Consolidated with 11-1177

---

On Petition for Review of a Final Order
of the U.S. Nuclear Regulatory Commission

---

*Elizabeth Miller*, pro hac vice, argued the cause for the petitioners. *Anthony Z. Roisman*, *John Beling* and *Christopher M. Kilian* were on brief. *Tricia K. Jedele* entered an appearance.

*Mark D. Davis* and *Christopher J. Wright* were on brief for *amici curiae* Riverkeeper et al. in support of the petitioners. *Timothy J. Simeone* entered an appearance.

*Eric T. Schneiderman*, Attorney General, Office of the Attorney General for the State of New York, and *Barbara D. Underwood*, Solicitor General, were on brief for *amicus curiae* State of New York in support of the petitioners. *John J. Sipos* and *Lisa M. Burianek*, Assistant Attorneys General, and *Monica B. Wagner*, Assistant Solicitor General, entered appearances.

*Sean D. Croston*, Attorney, United States Nuclear Regulatory Commission, argued the cause for the respondents. *John E. Arbab*, Attorney, United States Department of Justice, *Stephen G. Burns*, General Counsel, United States Nuclear Regulatory Commission, and *John F. Cordes, Jr.*, Solicitor, were on brief.

*Kevin P. Martin* argued the cause for intervenors Entergy Nuclear Operations, Inc. et al. *David R. Lewis* and *Elise N. Zoli* were on brief.

*Adam J. White* was on brief for *amicus curiae* Energy Future Coalition in support of the respondents.

Before: HENDERSON, ROGERS and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The Vermont Department of Public Service (DPS) and the New England Coalition (NEC) petition for review of a decision of the Nuclear Regulatory Commission (NRC, Commission), issuing to Entergy Nuclear Vermont Yankee, LLC and Entergy Nuclear Operations, Inc. (collectively, Entergy) a renewed license to operate the Vermont Yankee Nuclear Power Station (Vermont Yankee). The petitioners contend the license renewal was unlawful because Entergy failed to furnish a state Water Quality Certification (WQC) which they assert was required under section 401(a)(1) of the Clean Water Act (CWA), 33 U.S.C. § 1341(a)(1). We conclude the petitioners waived their WQC

objection because they repeatedly failed to present it directly to the Commission and thereby failed to exhaust their administrative remedies.

**I.**

The Atomic Energy Act (AEA) authorizes the NRC to issue an initial license to operate a nuclear power plant for a term of up to 40 years. 42 U.S.C. § 2133(a), (c). Pursuant to this authority, the Atomic Energy Commission (AEC), the NRC's predecessor,[1] issued a 40-year license to operate Vermont Yankee on March 21, 1972. Vermont Yankee Nuclear Power Corp.; Notice of Issuance of Facility Operating License, 37 Fed. Reg. 6345 (Mar. 28, 1972). In April 1970, while the licensing proceeding was ongoing, the Congress amended the Federal Water Pollution Control Act, the precursor to the CWA, to add the provisions of the Water Quality Improvement Act, Pub. L. No. 91-224, tit. I, 84 Stat. 91 (1970). Section 21(b) of the Federal Water Pollution Control Act required that any applicant for a federal license or permit to conduct an activity that might "result in any discharge into the navigable waters of the United States . . . provide a certification from the State in which the discharge originates or will originate . . . that there is reasonable assurance . . . that such activity will be conducted in a manner which will not violate applicable water quality standards." *Id.* § 102, 84 Stat. at 108. Accordingly, because Vermont Yankee planned to use water from the Connecticut River to cool its reactor and then discharge the water back into the river, Entergy's predecessor licensee obtained a WQC from the State of Vermont in October 1970 to support its operating license application. In October 1972, after Vermont Yankee's initial

---

[1]In 1974, the Congress abolished the AEC and transferred its licensing and related regulatory functions to the NRC. Energy Reorganization Act of 1974, Pub. L. No. 93-438, §§ 104(A), 201(F), 88 Stat. 1233, 1237, 1243 (codified at 42 U.S.C. §§ 5814(a), 5841(f)).

operating license issued, the Congress enacted the Federal Water Pollution Control Amendments of 1972 (now the CWA), incorporating the section 401 WQC requirement as follows:

> Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate . . . that any such discharge will comply with the applicable provisions of [33 U.S.C. §§ 1311, 1312, 1313, 1316, and 1317]. . . . No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence. No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be.

Pub. L. No. 92-500, § 2 (§ 401(a)(1)), 86 Stat. 816, 877-78 (1972) (codified at 33 U.S.C. § 1341(a)(1)); Vermont Yankee's 1970 WQC "continue[d] in full force and effect" thereafter pursuant to the CWA's savings provision. *Id*. § 4, 86 Stat. at 897.

An operating licensee may also be required to maintain a permit issued under the "National Pollutant Discharge Elimination System" (NPDES) pursuant to CWA section 402. Section 402 authorizes the Environmental Protection Agency (EPA) to "issue a permit for the discharge of any pollutant, or combination of pollutants . . . upon condition that such discharge will meet . . . all applicable requirements under [42 U.S.C. §§]

1311, 1312, 1316, 1317, 1318, and 1343." 33 U.S.C. § 1342.[2] Section 402(b) allows a state to obtain EPA approval to administer its own NPDES program, 33 U.S.C. § 1342(b), and in 1974, the State of Vermont did just that. Vermont issued Vermont Yankee a NPDES permit in 1978 and has renewed it successively upon expiration or amendment. Most recently the Vermont Agency of Natural Resources (VANR) renewed it for a five-year term in 2001. *See In re Entergy Nuclear Vt. Yankee Discharge Permit*, 989 A.2d 563, 568-69 (Vt. 2009).[3]

On January 25, 2006, Entergy filed an application with the NRC for a 20-year renewal of Vermont Yankee's operating license, which was set to expire on March 21, 2012. Included

---

[2]"Each permit must set out the specific conditions necessary to ensure that the permit holder's discharge of pollution will comply with the water standards mandated by the CWA." *Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 3 (D.C. Cir. 2011) (citing 33 U.S.C. § 1342(a)(2)).

[3]Although the permit expired by its terms in 2006, because Entergy timely filed for renewal on September 30, 2005, Vermont Yankee has continued to operate under the authority of the 2001 permit pursuant to Vermont law. *In re Entergy Nuclear*, 989 A.2d at 569 n.4 (citing 3 Vt. Stat. Ann. § 814(b) ("When a licensee has made timely and sufficient application for the renewal of a license or a new license with reference to any activity of a continuing nature, the existing license does not expire until the application has been finally determined by the agency, and, in case the application is denied or the terms of the new license limited, until the last day for seeking review of the agency order or a later date fixed by order of the reviewing court.")). VANR intends to process the renewal application in summer 2012 after EPA issues a rule addressing effluent limitation standards for cool water intake structures under CWA section 316(b), 33 U.S.C. § 1326(b). Pet'rs' Resp. to Court Req. re: Status of Vt. Yankee Nuclear Power Station Discharge Permit, ex. A (filed May 21, 2012) (March 7, 2012 letter from VANR to Vt. Pub. Serv. Bd.); *see Hydro Res., Inc.*, 48 N.R.C. 119 (1998).

with the application was an environmental report, as required under 10 C.F.R. § 51.45. In a section titled "Water Quality (401) Certification," the environmental report stated:

> As reported in the [Final Environmental Statement] (1972), the Vermont Water Resources Board provided a water quality certification on October 29, 1970, as amended on November 26, 1971, reflecting its receipt of reasonable assurance that operation of Vermont Yankee will not violate applicable water quality standards. In addition, the current and effective NPDES permit issued by the Vermont Agency of Natural Resources reflects continued compliance with applicable CWA standards. Excerpts of this permit are included in Attachment D.

Vermont Yankee Nuclear Power Station, Applicant's Environmental Report, Operating License Renewal Stage § 9.2.1, at 9-1 (Jan. 25, 2006) (Environmental Report). Appended to its application was a table setting out Vermont Yankee's "Environmental Permits and Compliance Status," which identified a 2001 section 402 NPDES permit issued by VANR, set to expire on March 31, 2006, but made no mention of any section 401 WQC. *Id*. app. E.

On March 27, 2006, the NRC published a notice announcing it had accepted the Vermont Yankee license renewal application and planned to prepare a site-specific environmental impact statement therefor as a supplement to its Generic Environmental Impact Statement for License Renewal of Nuclear Power Plants (May 1996) (GEIS) pursuant to the National Environmental Policy Act of 1979 (NEPA), 42 U.S.C. §§ 4321 et seq., and the NRC's NEPA regulations, 10 C.F.R. pt.

51.[4]  Notice of Acceptance for Docketing of the Application and Notice of Opportunity for Hearing Regarding Renewal of Facility Operating License, 71 Fed. Reg. 15,220, 15,220 (Mar. 27, 2006).  The notice declared that "any person whose interest may be affected" by the proceeding and who wished to participate as a party therein should file a "written request for a hearing and a petition for leave to intervene . . . in accordance with the Commission's 'Rules of Practice for Domestic Licensing Proceedings' in 10 C.F.R. Part 2." *Id*. at 15,221.  The notice further directed that any petition to intervene set forth the petitioner's interest and "the specific contentions which the petitioner/requestor seeks to have litigated at the proceeding" pursuant to 5 C.F.R. § 2.309(a). *Id*.  Four parties, including DPS and NEC, filed timely motions for a hearing or to intervene and an Atomic Safety and Licensing Board (Board)[5] was established to preside over the renewal proceeding.

DPS and NEC filed, respectively, three and six contentions challenging Entergy's application, only one of which is relevant here.   NEC's "Contention 1" asserted that "Entergy's

---

[4]The GEIS, initially promulgated in 1996, addresses issues that "are common to all nuclear power plants, or to a sub-class of plants[; a]s such, the NRC does not analyze [them] afresh with each individual plant operating license application." *Massachusetts v. United States*, 522 F.3d 115, 120 (1st Cir. 2008); *see* Environmental Review for Renewal of Nuclear Power Plant Operating Licenses, 61 Fed. Reg. 28,467 (June 5, 1996).  Instead, the Commission addresses only "non-generic issues that require site-specific analysis for each individual licensing proceeding." *Massachusetts*, 522 F.3d at 120.

[5]"[T]he Commission is authorized to establish one or more atomic safety and licensing boards, each comprised of three members, . . . to conduct such hearings as the Commission may direct and make such intermediate or final decisions as the Commission may authorize with respect to the granting, suspending, revoking or amending of any license or authorization . . . ."  42 U.S.C. § 2241(a).

environmental report (ER) failed to 'sufficiently assess[]' the environmental impacts of the license renewal, specifically the impacts of increased thermal discharges into the Connecticut River over the 20-year license renewal period." *Entergy Nuclear Vt. Yankee, LLC*, 64 N.R.C. 131, 175 (Sept. 22, 2006) (alteration in original). NEC contended in particular:

> Entergy's reliance solely on its NPDES permit is not sufficient because the permit is under appeal and, even if issued, will only be valid for 5 years, (2006-2011), and thus will not cover the cumulative impacts of thermal discharges over the 20-year period of the license renewal term (2012-2032).

*Id*. Entergy answered, inter alia, that once it provided a valid Vermont NPDES permit, "no further analysis" was required. *Id*. at 176. In its reply, NEC asserted, for the first time, that Entergy was "also obligated to obtain a state water certification under section 401 . . . and that Entergy had not done so." *Id*. at 177.

Entergy moved to strike portions of NEC's reply, including "NEC's new claims regarding 401 certification" which were not "related to the purported bases for the original contention." Entergy's Mot. to Strike Portions of NEC's Reply 10 (July 10, 2006). Entergy explained that "the allegations concerning Contention 1 in NEC's Petition related solely to whether the Environmental Report had adequately addressed the impacts of a 1° increase in the thermal effluent limitations recently approved in an amendment to the NPDES permit" and neither Contention 1 nor Entergy's response "had anything to do with the need for a section 401 certification," which was "newly alleged." *Id*. In reply, NEC stated it was "important to note that §[ ]401 Water Quality Certification is jurisdictional and imposes an independent obligation on Entergy and the NRC, regardless of whether the need for certification is raised as a contention." NEC's Opp'n to Entergy's Mot. to Strike Portions of NEC's Reply 7 (July 20, 2006).

Following oral argument before the Board in August 2006, NEC filed a "Late Contention or, Alternatively, Request for Leave to Amend or File a New Contention" (Late Contention/Req. to Amend) (Aug. 7, 2006), which attempted to add the section 401 objection as a further basis for Contention 1:

> Further basis demonstrating the inadequacy of Entergy's amended environmental report is the absence of a CWA § 401 Water Quality Certification. Entergy is on notice that its requested license extension cannot issue without a § 401 Certification. Yet Entergy's amended environmental report makes no mention of any effort to seek and obtain § 401 Certification.

Late Contention/Req. to Amend, at 4-5. After Entergy and NRC staff responded in opposition, NEC filed a reply stating:

> Based on NEC's prior filings in this matter, Entergy is on notice that its requested license extension cannot issue without a Clean Water Act § 401 certification. Astonishingly, Entergy's Amendment 6 to its Environmental Report nonetheless makes no mention of this issue. . . .[1]

_____

[1]Additionally, Entergy has an independent obligation to obtain a §[ ]401 certification, and the NRC is jurisdictionally limited to acting in conformity with §[ ]401 requirements. 33 U.S.C. § 1341; *S.D. Warren v. State of Maine*, 547 U.S. [370, 373] (2006).

NEC's Reply to Entergy & NRC Staff's Answers to NEC's Late Contention/Req. to Amend, at 5-6 & n.1 (Aug. 28, 2006).

On September 22, 2006, the Board admitted for hearing several of NEC's contentions, including Contention 1, but granted Entergy's motion to strike the "portions of NEC's Reply that relate[d] to certification under 401," "agree[ing] with Entergy that NEC's attempt to introduce an entirely new

argument regarding the alleged need for a section 401 certification is not permissible in a reply." *Entergy Nuclear Vt. Yankee, LLC*, 64 N.R.C. 131, 182 (Sept. 22, 2006).[6] On October 2, 2006, the Board denied NEC's Late Contention/Request for Leave to Amend as moot because "the Board "s[aw] no difference between NEC Contention 1, as admitted, and the proposed amended contention." Mem. and Order, at 6, *Entergy Nuclear Vt. Yankee*, LLC, Docket No. 50-271-LR (Oct. 30, 2006). With regard to the absence of a new section 401 permit, the Board rejected the assertion by its staff and Entergy that NEC's objection was "too late" but agreed with Entergy that "the need for a CWA § 401 certification is simply irrelevant to NEC's contention that Entergy failed to assess impacts to water quality." *Id.* at 7. The Board explained: "A CWA § 401 certification is a document issued by the State certifying that a proposed discharge satisfies the State's water quality standards and criteria. But a CWA § 401 certification is simply an independent statutory requirement, and neither NEPA nor 10 C.F.R. Part 51 incorporates or requires it." *Id.* at 7-8.

In December 2006, the NRC published a Draft Supplemental Environmental Impact Statement (Draft SEIS). Generic Envtl. Impact Statement for License Renewals of Nuclear Plants, Supp. 30 (Regarding Vt. Yankee Nuclear Power Plant) (Dec. 2006) (Draft Report for Comment). An appendix to the Draft SEIS enumerated the required governmental approvals, pursuant to 10 C.F.R. § 51.71, citing Entergy's 2001 NPDES permit but making no mention of a section 401 WQC. *Id.* app. E. Both the Draft SEIS text and a separate Federal

---

[6]The NRC subsequently reversed the Board's order insofar as it agreed to hear Contention 1 on the ground that Vermont had already addressed effluent limitations in its NPDES permit and the AEA precludes the Commission from "second-guessing the conclusions in NPDES permits or imposing [its] own effluent limitations." *Entergy Nuclear Vt. Yankee, LLC*, 65 N.R.C. 371, 376-77 (Apr. 11, 2007).

Register notice published concurrently solicited comments on the Draft SEIS. The petitioners submitted no responsive comment objecting to the lack of a section 401 WQC. The NRC issued its Final Supplemental Environmental Impact Statement (Final SEIS) in August 2007, again listing the section 402 approval but not mentioning section 401. Again, the petitioners made no response to section 401's absence.

The Board held an evidentiary hearing in July 2008 and, on November 24, 2008, issued a Partial Initial Decision resolving all but one of the remaining admitted contentions. *Entergy Nuclear Vt. Yankee, LLC*, 68 N.R.C. 763 (2008). The order stated:

> With the exception of [two contentions resolved in favor of NEC and DPS and the one unresolved contention] and the opportunity to seek reconsideration of facts officially and judicially noticed, this Partial Initial Decision shall constitute the final decision of the Commission forty (40) days after the date of its issuance, unless, within fifteen (15) days of its service, a petition for review is filed in accordance with 10 C.F.R. §§ 2.1212 and 2.341(b). Filing a petition for review is mandatory for a party to exhaust its administrative remedies before seeking judicial review. 10 C.F.R. § 2.341(b)(1).

*Id*. at 897. Both of the regulations the Board's decision cited— 10 C.F.R. §§ 2.1212 and 2.341—plainly state: "Unless otherwise authorized by law, a party to an NRC proceeding must file a petition for Commission review before seeking judicial review of an agency action."[7]

---

[7]Regulation 2.1212, titled "Petitions for Commission review of initial decisions," states in its entirety:

> Parties may file petitions for review of an initial decision

On March 10, 2011, the Commission issued a Memorandum and Order affirming a Board rejection of a contention litigated by NEC (but unrelated to section 401) and purporting to "terminate this proceeding." *Entergy Nuclear Vt. Yankee, L.L.C.*, Docket No. 50-271-LR, CLI-11-02, 2011 WL 864757, at *8 (Mar. 10, 2011 NRC) (emphasis omitted). Accordingly, on March 21, 2011, the Commission issued a renewed license to operate Vermont Yankee for a twenty-year term. Entergy Nuclear Operations, Inc.; Vermont Yankee Nuclear Power Station; Notice of Issuance of Renewed Facility Operating License No. DPR-28 for an Additional 20-Year Period; Record of Decision, 76 Fed. Reg. 17,162 (Mar. 28, 2011). NEC and DPS petitioned for review and Entergy intervened.

## II.

The court has jurisdiction under the Hobbs Act, 28 U.S.C. §§ 2341 et seq., to review "all final orders" of the NRC that are "made reviewable by section 2239 of title 42." 28 U.S.C. §§

---

under this subpart in accordance with the procedures set out in § 2.341. Unless otherwise authorized by law, a party to an NRC proceeding must file a petition for Commission review before seeking judicial review of an agency action.

10 C.F.R. § 2.1212. Regulation 2.341 in turn provides in relevant part:

(b)(1) Within fifteen (15) days after service of a full or partial initial decision by a presiding officer, and within fifteen (15) days after service of any other decision or action by a presiding officer with respect to which a petition for review is authorized by this part, a party may file a petition for review with the Commission on the grounds specified in paragraph (b)(4) of this section. Unless otherwise authorized by law, a party to an NRC proceeding must file a petition for Commission review before seeking judicial review of an agency action.

10 C.F.R. § 2.341(b)(1).

2342(4); *see Honeywell Int'l, Inc. v. NRC*, 628 F.3d 568, 575 (D.C. Cir. 2010).[8] We nonetheless decline to exercise jurisdiction because the petitioners failed to exhaust their administrative remedies and accordingly waived their section 401 argument.

We have recognized two distinct species of exhaustion requirements: (1) "non-jurisdictional exhaustion," which is "a judicially created doctrine requiring parties who seek to challenge agency action to exhaust available administrative remedies before bringing their case to court"; and (2) "jurisdictional exhaustion," which "arises when Congress requires resort to the administrative process as a predicate to judicial review." *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004) (internal quotation marks omitted). "We presume exhaustion is non-jurisdictional unless 'Congress states in clear, unequivocal terms that the judiciary is barred from hearing an action until the administrative agency has come

---

[8]Section 2239 makes "subject to judicial review . . . [a]ny final order entered in any proceeding" under the AEA, 42 U.S.C. ch. 23, "for the granting, suspending, revoking, or amending of any license." 42 U.S.C. § 2239(b)(1), (a).  Entergy contends the court lacks Hobbs Act jurisdiction here because the petitioners failed to timely petition for review within 60 days following the NRC's March 10, 2011 order, which "resolved all challenges brought by DPS and NEC and terminated the proceeding."  Intervenor's Br. 2 (citing *Entergy Nuclear Vt. Yankee, LLC*, CLI-11-02, 2011 WL 864757, at *8); *see* 28 U.S.C. § 2344 ("Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies."). The cited order, however, which was unrelated to the petitioners' section 401 objection, is not the "final order" the petitioners claim aggrieved them.  Their claimed aggrievement is the absence of a section 401 WQC when the license renewal itself issued ten days later, on March 21, 2011; the petitions for review were timely filed within 60 days thereafter, on May 20, 2011.

to a decision.' " *Id*. at 1248 (quoting *I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton Tri Indus.*, 727 F.2d 1204, 1208 (D.C. Cir. 1984)). The language of the Hobbs Act offers no such unequivocal bar. *Cf. Daniels v. Union Pac. R.R. Co.*, 530 F.3d 936, 941 n. 9 (D.C. Cir. 2008) (relying in part on exhaustion's non-jurisdictional presumption in declining to affirm district court's dismissal of Hobbs Act action based on jurisdictional failure to exhaust). Precedent, however, counsels against our reviewing the petitioners' unexhausted section 401 claim.

In *Sims v. Apfel*, the United States Supreme Court observed that when "an agency's regulations [] require issue exhaustion in administrative appeals[,] . . . courts reviewing agency action regularly ensure against the bypassing of that requirement by refusing to consider unexhausted issues." 530 U.S. 103, 108 (2000). In *Environmentel, LLC v. FCC*, relying on *Sims*, we concluded the petitioner had waived two issues it urged on appeal—one it had presented to a Federal Communications Commission (FCC) bureau but not to the FCC itself and one it had not raised at all at the administrative level. 661 F.3d 80, 84 (D.C. Cir. 2011). We based our conclusion on an FCC regulation which (1) authorizes a "person aggrieved by any action taken pursuant to delegated authority [to] file an application requesting review of that action by the [FCC]," (2) requires a party seeking review by the full Commission of a decision by a delegated bureau to "concisely and plainly state the questions presented for review" and (3) provides that the "filing of an application for review shall be a condition precedent to judicial review of any action taken pursuant to delegated authority." 47 C.F.R. § 1.115(a), (b)(1), (k); *see Environmentel*, 661 F.3d at 83-84. Under the regulation, we determined, "the full FCC must have the opportunity to review all cases and all aspects of those cases before parties may exercise their statutory right to appeal to this Court." 661 F.3d at 84. We find the NRC regulations applicable here are materially indistinguishable from the FCC regulations in

*Environmentel.* In combination, 10 C.F.R. §§ 2.341 and 2.1212 (1) authorize "a party [to] file a petition for review with the Commission" of an initial decision or action by "the presiding officer"—here the Board; (2) require that the petition contain a "concise statement why in the petitioner's view the decision or action is erroneous" and (3) provide that "[u]nless otherwise authorized by law, a party to an NRC proceeding must file a petition for Commission review before seeking judicial review of an agency action." 10 C.F.R. § 2.341(b)(1), (b)(2)(iii), § 2.1212. Thus, like the petitioner in *Environmentel*, the petitioners here were required under agency regulations to afford the full Commission an opportunity to pass on the section 401 issue before seeking judicial review. And they had repeated opportunities to do so.

They could have petitioned the Commission for interlocutory review of the Board's denial of their Late Contention/Request to Amend pursuant to 10 C.F.R. § 2.341(f)(2). Or they could have filed a new, separate contention limited to their section 401 objection either immediately after the Board's denial (which advised that, although the objection was not "too late," it involved "an independent statutory requirement" that was "simply irrelevant to [Contention 1]") or upon discovering that neither the Draft nor the Final SEIS mentioned a section 401 WQC, *see* 10 C.F.R. § 2.309(c), (f)(2)—and, if the Board rejected the contentions, they could have petitioned the NRC for review. Or they could have submitted a comment for the Commission's review in response to the December 2006 Draft SEIS and the Commission's express solicitation of comment thereon. Or, they could have filed a petition for Commission review following the Board's November 24, 2008 Partial Initial Decision (which omitted any mention of section 401) pursuant to 10 C.F.R. § 2.341(b)(1). Yet, notwithstanding all of these opportunities to fulfill the exhaustion requirement—and the Board's admonition that "[f]iling a petition for review is

mandatory for a party to exhaust its administrative remedies before seeking judicial review[,] 10 C.F.R. § 2.341(b)(1)," *Entergy Nuclear Vt. Yankee, LLC*, 68 N.R.C. at 897—the petitioners sat silent for two and one-half years thereafter, raising their section 401 objection only *after* the Commission issued the license renewal in March 2011. In so doing, the petitioners undermined the functions exhaustion serves: "giving agencies the opportunity to correct their own errors, affording parties and courts the benefits of agencies' expertise, and compiling a record adequate for judicial review." *Avocados Plus,* 370 F.3d at 1247 (quotation marks and brackets omitted). By failing to exhaust their section 401 argument, they waived judicial consideration thereof. *See Environmentel*, 661 F.3d at 83 ("Environmentel waived its right to raise the *ex parte* and public notice issues because it failed to raise those issues before the full Commission . . . .").

The petitioners contend it would have been futile to raise the section 401 issue before the Commission, which "has clearly held that the issue of whether an applicant possesses a required CWA authorization is not appropriate for consideration as a contention in NRC licensing proceedings." Reply Br. 19-20. None of the decisions they cite, however, supports their contention the Commission would have refused to decide the issue here, namely, whether an applicant for license renewal has obtained the requisite section 401 WQC before a license issues. Rather, in each of the decisions, the Commission (or the Board) declined either to undertake to evaluate for itself whether a particular permit was needed, to second guess the EPA or state agency's decision to issue an environmental permit or to postpone conducting an application proceeding until a required permit or certification had been obtained.[9] As the petitioners

---

[9]*See Hydro Res., Inc.*, 48 N.R.C. 119, 120 (1998) ("Whether non-NRC permits are required is the responsibility of bodies that issue

acknowledge, the NRC's obligation to insure that operators obtain a § 401 WQC is purely "ministerial"—it does not require the NRC "to adjudicate substantive compliance issues under § 401 or state law, including the state law determinations of whether water quality standards will be met." Pet'rs' Br. 23. There is no reason to believe the NRC would have refused to carry out its obligation to ensure compliance with section 401's WQC requirement.[10] *Cf. Commonwealth of Kentucky ex rel.*

_____

such permits . . . ."); *Va. Elec. & Power Co.*, 68 N.R.C. 294, 329 (2008) ("evaluat[ing] whether [cooling unit] will comply with CWA or state and local permitting requirements" was "outside the scope of th[e] proceeding"); *Dominion Nuclear Conn. Inc.*, 67 N.R.C. 421, 447 & n.151 (2008) (whether applicant "has a valid NPDES permit is outside the scope of this [Board] proceeding" (citing *Dominion Nuclear Conn., Inc.*, 60 N.R.C. 81, 92-93 (2004) ("While 10 C.F.R. § 51.45(d) requires an applicant seeking a license renewal to 'list all Federal permits, licenses, approvals, and other entitlements which must be obtained in connection with the proposed action,' it does not impose a requirement that the applicant actually possess such permits *at the time of application*.") (emphasis added))); *Pub. Serv. Co. of N.H.*, 2 N.R.C. 693, 693 (1975) (Board declined to stay NRC proceeding pending outcome of EPA review of its previous determinations, noting "Board, in its discretion, should proceed simultaneously with EPA so that each will reach its conclusions or decision in due course and with all reasonable dispatch"); *Wis. Elec. Power Co.*, 8 A.E.C. 928, 930 (1974) (denying request to delay NRC proceeding as "premature" because state environmental agency had not yet issued section 401 WQC, noting "[a]s a general rule it is the practice of the Commission to pursue its administrative procedures while other state and local proceedings are under way").

[10]Indeed, the Commission took the position in its GEIS that the section 401 WQC requirement may be satisfied if an applicant has a NPDES permit because "issuance of an NPDES permit by a state water quality agency implies certification under Section 401." GEIS § 4.2.1.1, at 4-4. The NRC asserts this is the rationale it would have

*Stephens v. NRC*, 626 F.2d 995 (D.C. Cir. 1980) (upholding NRC construction work authorization  based on Indiana WQC and NRC's determination Ohio WQC was not needed because section 401(a)(1) discharge originated in Indiana rather than Ohio).

The petitioners further assert their failure to exhaust should be excused under *Avocados Plus*.  There, we noted a court "may, in its discretion, excuse exhaustion if 'the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further.' " 370 F.3d at 1247-48 (quoting *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992)).  We find no such exculpatory circumstances here. The petitioners proffer

---

proffered had the petitioners sought review of the Board's decision as required.  Appellee's Br. 33-39.  In addition, VANR suggested in both its scoping comments and its Draft SEIS comments that a section 402 NPDES permit is sufficient to allay cooling system concerns.  *See* VANR Memo. to NRC 1 (June 23, 2006) ("As we understand it, these issues are associated with intake structures and thermal discharge issues which require a NPDES permit.  The requirements of the Clean Water Act and the NPDES permit will provide assurance that the impacts of permitted intake structures and discharges meet the applicable federal and state requirements."); VANR Memo. to NRC 5-6 (Mar. 8, 2007) ("[B]ecause the [CWA] requires that the discharge and the cooling water operations and structures comply with stringent standards that ensure the protection and propagation of a balanced indigenous community of shellfish, fish and wildlife[,] VANR concurs with the NRC conclusion that the impacts of the thermal discharge and fish impingement and entrainment [are] likely to be small.  This is true, in large part, because the process associated with the NPDES permit is iterative in that it entails ongoing monitoring and review, and allows VANR to adjust the permit conditions regarding the cooling system operations and thermal regime.  . . . The applicable state and federal standards under the CWA are protective of water quality and the environment and must be renewed every five years.").

three reasons why "the instant dispute is the 'occasional[]' case in which 'exhaustion will not fulfill these ends' and is unnecessary": (1) there are " 'no facts in dispute,' . . . regarding the gravamen of Petitioners' §401 claim"; (2) " 'the disputed issue[s]' in this case are purely legal ones, and thus lie 'outside the agency's expertise' "; and (3) the petitioners "gave NRC numerous 'opportunit[ies] to correct [its] own errors' . . . by timely presenting the undisputed fact that, on this record, [Entergy] did not possess a §401 certification and that no license could be issued without such a certification." Reply Br. 25-28 (quoting *Avocados Plus*, 370 F.3d at 1247). Addressing the last point first, the petitioners did not at any point in the administrative proceedings squarely present the section 401 issue to the Commission itself, as the regulations require—only to the Board. *See* 10 C.F.R. §§ 2.1212, 2.341(b)(1). Moreover, while it is true that the facts are not in dispute, the Commission was deprived of the opportunity to advance and explain its position that Entergy's NPDES permit may "impl[y]" certification under section 401, *see supra* note 10, or to consider Entergy's claim that the 1970 WQC put it in compliance with the section 401 requirement, *see* Environmental Report § 9.2.1, *supra* p. 6. Under these circumstances, we do not find that any interest of the dilatory petitioners outweighs the Commission's interest in efficiently administering its own statutory responsibilities and, accordingly, decline to exercise our discretion to excuse the failure to exhaust. *See Woodford v. Ngo*, 548 U.S. 81, 90 2006) ("[A]s a general rule[,] courts should not topple over administrative decisions unless the administrative body not only has erred, *but has erred against objection made at the time appropriate under its practice*." (emphasis in original; quotation marks omitted)); *Malladi Drugs & Pharm., Ltd. v. Tandy*, 552 F.3d 885, 891, 384 (D.C. Cir. 2009) ("Consistent with the concerns underlying exhaustion and waiver of claims, [appellants'] failure 'to pursue normal administrative remedies' here allowed it to 'side-step[ ] a

corrective process which might have cured or rendered moot the very defect later complained of in court.' " (quoting *McGee v. United States*, 402 U.S. 479, 483 (1971)) (first alteration added)).

For the foregoing reasons, we conclude that the petitioners failed to exhaust their administrative remedies before the Commission and thereby waived the right to raise their section 401 objection on judicial review. Accordingly, we deny their petitions for review.

*So ordered.*