# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 15, 2020

Lyle W. Cayce
Clerk

No. 18-41067

_____

PALM VALLEY HEALTH CARE, INCORPORATED,

Plaintiff-Appellant

v.

ALEX M. AZAR II, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; PALMETTO GBA, L.L.C.,

Defendants-Appellees

_____

Appeal from the United States District Court
for the Southern District of Texas

_____

Before OWEN, Chief Judge, and HAYNES and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

With annual spending topping half a trillion dollars, Medicare is the largest recipient of federal funds after Social Security and defense.[1]  With so many tax dollars at stake, Congress created an administrative process through which Medicare can recover overpayments.  Because of the massive number of claims, an audit of each one is not feasible.  So federal law allows Medicare to investigate a select number of claims from a provider.  If the audit of that sample reveals "a sustained or high level of payment error," Medicare can

---

[1] Leigh Angres & Jorge Salazar, *The Federal Budget in 2018*, Congressional Budget Office (June 2019), https://www.cbo.gov/system/files/2019-06/55342-2018-budget.pdf.

extrapolate that overpayment rate to a larger number of similar claims.  42 U.S.C. § 1395ddd(f)(3)(A).

An audit of Palm Valley Health Care, a home health care provider, revealed that a significant percentage of the sampled claims did not meet Medicare coverage requirements.  Extrapolating that overpayment rate to all claims paid over the relevant time period resulted in a repayment demand of more than $12 million.  Palm Valley brings constitutional, statutory, and evidentiary challenges to that decision.  Finding no error, we AFFIRM.

I.

The Department of Health and Human Services (HHS), acting through a Medicare contractor, audited claims Palm Valley submitted between July 1, 2006, and January 31, 2009.  Palm Valley was selected for review because it had submitted an unusually large number of claims involving five or more consecutive home health care episodes.  An episode is sixty days long and the typical claim involves two consecutive episodes.  During the audit period, Palm Valley submitted 10,699 Medicare claims.

Out of those thousands, the contractor sampled 54 and concluded that 29 of them provided services to beneficiaries who were not eligible for home health care.  Medicare will cover home health services if the beneficiary is homebound, under the care of a physician, in need of skilled services, and under a plan of care.  42 C.F.R. § 409.42.  Based on interviews of beneficiaries and their friends and families, as well as a review of medical records, the contractor concluded that the 29 beneficiaries either were not homebound or did not need skilled care.[2]  As a general matter, an individual is homebound if she has a condition restricting her ability to leave home without assistance.  42 U.S.C. § 1395f(a).  The overpayment for those 29 claims was $81,681.03.

---

[2] Palm Valley does not appeal the agency's determinations that various beneficiaries did not need skilled care.

No. 18-41067

Extrapolation turned that figure into a total repayment demand of $12,589,185.

Palm Valley sought review of the overpayment finding. It argued that the beneficiaries qualified as homebound and thus were eligible for home health services. It also challenged the sample the auditor used and the extrapolation methodology used to reach the $12 million repayment figure. Notably, however, Palm Valley did not press a defense Medicare allows for a provider that "did not know, and could not reasonably have been expected to know" that it was receiving overpayments.[3] 42 U.S.C. § 1395pp(a)(2); *see also Caring Hearts Pers. Home Servs. v. Burwell*, 824 F.3d 968, 970 (10th Cir. 2016) (Gorsuch, J.) (calling this "[a] sort of good faith affirmative defense").

For the arguments Palm Valley was asserting, it had many opportunities to make them. Administrative review of overpayment decisions has several stages. The first allows a provider to seek a redetermination from the auditor. 42 U.S.C. § 1395ff(a)(3)(A). The auditor must complete its redetermination within 60 days. *Id.* § 1395ff(a)(3)(C)(ii). If the redetermination is unfavorable, the provider may then seek reconsideration from a qualified independent contractor, which likewise has a 60-day deadline. *Id.* § 1395ff(c)(3)(B)(i), (c)(3)(C)(i). The next step is an appeal to an administrative law judge (ALJ), who holds a hearing and reviews the overpayment finding *de novo. See id.* § 1395ff(d)(1)(A). The ALJ must render a decision within 90 days. *Id.* An unfavorable ALJ decision may be appealed to the Medicare Appeals Council, which also faces a 90-day deadline. *Id.* § 1395ff(d)(2)(A). If the provider fails

---

[3] In response to questioning at oral argument about the overpayment scheme, the government noted the availability of this defense and Palm Valley's failure to raise it before the Appeals Council. That led Palm Valley to file a postargument motion for leave to file a supplemental brief on its interpretation of yet another statute (42 U.S.C. § 1395gg) that it did not invoke before the Appeals Council. That motion is denied.

No. 18-41067

at this fourth and final stage of administrative review, it may seek review in federal district court. *Id.* § 1395ff(b)(1)(A).

Although each stage of administrative review has a statutory deadline, HHS routinely fails to meet those dates. From start to finish, the average appeal takes about five years, far in excess of the statute's approximately one year. *Maxmed Healthcare, Inc. v. Price*, 860 F.3d 335, 344–45 (5th Cir. 2017). The statute recognizes that the agency may not meet the deadlines. If HHS fails to meet the review deadline at any stage, a provider may escalate its appeal and immediately jump to the next stage of review. 42 U.S.C. §§ 1395ff(c)(3)(C)(ii), (d)(3)(A)–(B).

Palm Valley appealed through the entire administrative process. At the redetermination stage, the contractor determined that one partial denial among the 29 was in error. At the reconsideration stage, the independent contractor found that Medicare did not cover the claims for 29 beneficiaries. The ALJ subsequently reviewed the overpayment determinations and concluded that 27 claims in the sample of 54 should not have been paid. The Medicare Appeals Council mostly affirmed the ALJ's decision, but concluded that the claims for two beneficiaries previously found to be uncovered were eligible claims. Full administrative review thus reduced the number of ineligible claims from 29 to 25, shaving a meaningful amount off the $12 million that Palm Valley originally owed.

Consistent with recent practice, the ALJ and Medicare Appeals Council issued their decisions roughly one-and-a-half years and three years after Palm Valley sought their review. Although HHS did not come close to meeting either 90-day deadline, Palm Valley did not escalate its appeal.

Palm Valley finally sought review in district court. The court affirmed the decision of the Medicare Appeals Council.

No. 18-41067

II.

Palm Valley argues that HHS violated due process by failing to meet the statutory deadlines at each stage of the administrative process. We have difficulty seeing how Palm Valley was denied due process.

Due process typically requires "some form of hearing . . . before an individual is finally deprived of a property interest." *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976). Palm Valley received a hearing before it had to give any money back to Medicare. Its argument is essentially that it had too many hearings—really too many appeals of a hearing—and that they took too long. It does not cite any Supreme Court or circuit level authority finding a due process violation for delays occurring during an administrative appeals process.[4] And violation of a statutory deadline does not automatically mean a lack of due process; the Constitution, not statutes, determine the minimum procedures that due process requires. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 538−39, 542 (1985) (recognizing that state statute created a property interest but applying *Matthews*' balancing test to determine what level of process the Due Process Clause required).

Even assuming the possibility of a due process violation arising from prolonged appeals of a hearing, Palm Valley failed to take advantage of the statutory escalation procedure that would have allowed it to expedite the process. Nor did it seek a federal court injunction to try and prevent recoupment. *See Family Rehab., Inc. v. Azar*, 886 F.3d 496 (5th Cir. 2018). One problem with allowing this after-the-fact complaint about delay is that it lets the provider have it both ways. Palm Valley took advantage of every

---

[4] It relies on *American Hospital Association v. Burwell*, 812 F.3d 183 (D.C. Cir. 2016), but that case does not address due process. If anything, it shows that Medicare providers may have another option when facing violations of the statutory deadline: mandamus relief. *Id.* at 132–34.

opportunity it had to undo the overpayment finding, and it took some bites out of the apple with partial success on some appeals. Only now, after going through every appeal, does it challenge the delay. *Contrast id.* (involving provider that brought action in district court once recoupment began because it faced a three-year delay before an ALJ).

The timing of Palm Valley's due process challenge also means it cannot show the substantial prejudice that is necessary for a due process claim to succeed. *United States v. Lober*, 630 F.2d 335, 337–38 (5th Cir. 1980) (per curiam). Palm Valley does not brief any theory of substantial prejudice, and none is apparent from the record. The roughly four-year delay did not affect HHS's ability to evaluate Palm Valley's claims, as the evidence that the agency drew on at each stage existed when Palm Valley first requested redetermination. Nor did the delay cause financial harm to Palm Valley. During the slow appeals process, HHS was not engaging in recoupment, the process by which Medicare holds back payments on new claims to cover overpayment findings that are still being appealed and thus may be overturned. *Contrast Family Rehab.*, 886 F.3d at 503 (holding that a district court had subject matter jurisdiction to consider a due process claim that a plaintiff subject to recoupment brought). In other words, HHS did not seek to recover any overpayment until the end of the appeals process. And as we have noted, Palm Valley preferred repeated review—with each level providing a new opportunity to succeed—to expeditious resolution of its claims. That choice to pursue each level of review shows that Palm Valley saw some benefit from pursuing multiple appeals despite the known delay each phase caused. Palm Valley has not established substantial prejudice from the delay.

The district court correctly rejected the due process claim.

III.

Turning from the process of the agency review to its substance, we consider Palm Valley's argument that the ALJ and Medicare Appeals Council applied the wrong definition of "homebound." An individual is homebound if he or she "has a condition . . . that restricts the ability of the individual to leave his or her home except with the assistance of another individual or the aid of a supportive device . . . or if the individual has a condition such that leaving his or her home is medically contraindicated." 42 U.S.C. § 1395f(a). The statute further explains that "[w]hile an individual does not have to be bedridden to be considered 'confined to his home,' the condition of the individual should be such that there exists a normal inability to leave home and that leaving home requires a considerable and taxing effort by the individual." *Id.* The ALJ and Medicare Appeals Council, citing the statute as well as Medicare Program Integrity Manuals, stated in their reviews that a homebound person must have a normal inability to leave home and leaving home must "require[] a considerable and taxing effort."

Palm Valley argues this was too demanding a standard. It argues that for an individual to qualify as homebound, the condition of the person "should"—but not *must*—"be such that there exists a normal inability to leave home and that leaving home requires a considerable and taxing effort by the individual." 42 U.S.C. § 1395f(a); *see also Caring Hearts*, 824 F.3d at 973 (recognizing that "should" indicates a normal inability to leave home without a taxing effort is a useful, but not dispositive, test for homebound status).[5] Under Palm Valley's reading of section 1395f(a), whether an individual actually left home is largely irrelevant, as the inquiry must turn on whether

---

[5] Palm Valley repeatedly analogizes this case to *Caring Hearts*, 824 F.3d at 970−71. It does not mention that *Caring Hearts* decided whether the section 1395pp good-faith defense, which Palm Valley did not assert, applied.

the beneficiary has a condition restricting his or her ability to leave home without assistance.

But Palm Valley raised this argument for the first time in the district court. A federal court reviewing an agency determination will not ordinarily consider arguments that a litigant could have raised before the agency but chose not to. *Gulf Restoration Network v. Salazar*, 683 F.3d 158, 174–75 (5th Cir. 2012). HHS limits the Medicare Appeals Council's review to objections a represented party asserts challenging the ALJ's ruling. 42 C.F.R. § 405.1112(c). The regulation tells a party that it must inform the Appeals Council if it believes the ALJ's ruling "is inconsistent with a statute, regulation, CMS ruling, or other authority." *Id*. § 405.1112(b). That covers the "homebound" argument Palm Valley raises now but did not mention before the Appeals Council. To allow Palm Valley to litigate an issue in federal court that it did not present to the Appeals Council would inappropriately "bypass[]" the agency's internal requirement.[6] *Sims v. Apfel*, 530 U.S. 103, 108 (2000); *see also*, *e.g.*, *Medwin Family Med. & Rehab., P.L.L.C. v. Burwell*, 2017 WL 685696, at *17 (Jan. 31, 2017 S.D. Tex. 2017) (declining to consider issues not raised before the Medicare Appeals Council). A failure to dispute the governing legal standard before the agency is especially problematic given that the issue permeates the review process. Raising the "must" versus "should" issue before

---

[6] When a court decides whether to impose an "issue-exhaustion requirement even in the absence of a statute or regulation," it considers how much the administrative proceeding resembles "normal adversarial litigation." *Sims v. Apfel*, 530 U.S. 103, 108−09 (2000). Because there is a regulation requiring parties to identify specific ALJ errors before the Appeals Council, *id*. at 108, we need not decide whether the Medicare overpayment appeals process is sufficiently adversarial to require exhaustion. *See, e.g., id*.; *Vermont Dept. of Pub. Serv. v. United States*, 684 F.3d 149, 157–58 (D.C. Cir. 2012) (applying exhaustion requirement, without assessing whether the administrative process qualified as "adversarial," because regulation required exhaustion in agency proceedings); *Wolfe v. Barnhart*, 446 F.3d 1096, 1103 n.5 (10th Cir. 2006) (summarizing *Sims* as recognizing that "exhaustion is generally required in review of adversarial administrative proceedings or where exhaustion is mandated by agency regulation").

the agency would have allowed it to determine whether there is any practical daylight between those standards on these facts, something that is far from apparent.  While judicial review of agency decisions plays an important role in correcting agency errors, it does not allow an inefficient redo based on arguments never presented to the agency the first time around.  Because Palm Valley failed to exhaust its challenge to the "homebound" standard, we cannot consider the question.

## IV.

We next consider Palm Valley's argument that HHS lacked substantial evidence for its finding that 25 beneficiaries were not homebound.  Substantial evidence[7] supports a finding that a patient is not homebound if "more than a mere scintilla" of evidence support the determination.  *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018) (quotation omitted).

That low evidentiary bar was met.  The main thrust of Palm Valley's evidentiary challenge is that the Medicare Appeals Council and ALJ relied too heavily on interviews of individuals (including the beneficiaries themselves), who indicated the beneficiaries were not homebound.  That testimony was unreliable, Palm Valley argues, because a significant amount of time, sometimes several years, had passed between the claims and the interviews.

As a general matter, Palm Valley is right that memories often fade over time.  Basic principles of our legal system, like statutes of limitations and the right to a speedy trial, reflect that view.  But the fact that passage of time may be grounds for impeaching testimony does not render that testimony

---

[7] We apply the substantial evidence standard rather than the Administrative Procedures Act's arbitrary and capricious standard because the parties agree that the former applies.  We thus do not resolve which applies.  *Cf. Baylor Cty. Hosp. Dist. v. Price*, 850 F.3d 257, 261 (5th Cir. 2017) ("assum[ing] only for the sake of argument that the APA's arbitrary and capricious standard applie[d]" and noting that "it probably ma[de] no difference" which deferential standard applied on review of Medicare's refusal to designate a hospital as a "critical access hospital").

irrelevant. This is the difference evidence law recognizes between relevancy and probative value. *Compare* FED. R. EVID. 401 (evidence is relevant if it makes a fact *any* more or less probable), *with* FED. R. EVID. 403 (excluding evidence if its tendency to make a fact more or less likely is too small relative to the costs of presenting it to the jury). Passage of time goes to the latter, not the former. Because even dated firsthand or eyewitness testimony about a beneficiary's health makes it more or less likely that the beneficiary was homebound, the interviews were undoubtedly relevant. In terms of probative value, as with impeachment evidence generally, the factfinder decides how much the passage of time undermines the credibility of testimony, if at all. Many considerations—including the level of detail the witness provides, the number of times the witness observed the beneficiary, and whether there is corroboration in the form of other witnesses or documents—will impact the reliability of the testimony.

The Appeals Council considered these factors when evaluating the interviews as part of its claim-by-claim review of the homebound question. Take, for instance, beneficiary R.L. The Council's determination that R.L. was not homebound relied in part on an interview with R.L.'s daughter two years after the dates of service. R.L.'s daughter described how two years earlier R.L. was able to drive to the barbershop and to visit his daughters. Also consider beneficiary F.D. Interviews with F.D. and a staff member in the building where F.D. lived revealed that F.D. was alert and frequently traveled outside the home, without assistance, for activities like shopping and visiting friends. For both these claimants, contemporary records corroborated the testimony. Clinical records demonstrated that R.L.'s medication changes could be managed without skilled care at home and that his diagnoses were unlikely to leave him confined to home. And Palm Valley's records showed multiple days when it had sent someone to F.D.'s residence, but the patient was not home.

No. 18-41067

Palm Valley's critique of the interviews is unavailing given the deferential standard of review.  The Appeals Council carefully evaluated the evidence on each claim in an 86-page opinion.  Substantial evidence supports HHS's determination that many beneficiaries were not homebound.

V.

The agency finding we have just upheld—that 25 claims were not eligible for payment because the patients were not homebound—does not on its own cause Palm Valley much financial harm.  But the extrapolation of that overpayment rate to Palm Valley's more than 10,000 claims does.  It thus is not surprising that Palm Valley also challenges that statistical analysis.

As we noted at the outset, HHS may use statistical extrapolation to determine overpayment amounts when the Secretary determines that "there is a sustained or high level of payment error."  42 U.S.C. § 1395ddd(f)(3)(A); *see also Maxmed*, 860 F.3d at 344−45.  The threshold determination that there are "sustained or high levels of payment errors" is not reviewable.  42 U.S.C. § 1395ddd(f)(3).

Palm Valley thus challenges not whether it was appropriate to use sampling and extrapolation, but the statistical methods the agency uses when performing those tasks.  It contends that the methodology does not pass muster under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), because it has not been peer reviewed or generally accepted in the relevant scientific community.  *Daubert*, however, does not apply in agency proceedings. *See Nat'l Taxpayers Union v. U.S. Soc. Sec. Admin.*, 302 F. App'x. 115, 121 (3d Cir. 2008); *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 n.4 (9th Cir. 2005); *Niam v. Ashcroft*, 354 F.3d 652, 660 (7th Cir. 2004).  It interprets Federal Rule of Evidence 702, and the federal rules of evidence do not govern agencies.  *Niam*, 354 F.3d at 660; *see also* 42 U.S.C. § 405(b)(1) (allowing evidence to be received in Social Security hearings "even though inadmissible under rules of evidence

11

to court procedure"). What is more, the procedural "gatekeeping" aspects of *Daubert*, aimed as they are at preventing the jury from being tainted by unreliable evidence, do not translate to agency proceedings for the same reason they do not fully translate to bench trials: in reaching a decision, a judge will only rely on evidence the judge deems reliable. *See Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 330 (5th Cir. 2010) (recognizing that we have "noted that the importance of the trial court's gatekeeper role is significantly diminished in bench trials . . . because, there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence" (citing *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000)). Whether a judge's reliability finding was correct will be tied up in the substantive review of the decision. That is why some courts recognize that the substantive aspect of *Daubert*, with its focus on reliability, is practically speaking already part of substantive review of agency decisions. *See Donahue v. Barnhart*, 279 F.3d 441 (7th Cir. 2002) (explaining that *Daubert*'s "idea that experts should use reliable methods . . . plays a role in the administrative process because every decision must be supported by substantial evidence").

In looking at the extrapolation from that substantive standpoint, we see no reversible error. The methodology that the agency employed resulted in a random sample of 54 of the 10,699 claims, the audit of which provided an unbiased estimate of the actual average overpayment for all 10,699 claims. *See* MEDICARE PROGRAM INTEGRITY MANUAL § 8.4.1.3. Palm Valley's own expert testified that the sample was a valid probability sample and that the agency applied the correct formulas to extrapolate an aggregate overpayment amount from that sample.

Palm Valley argues that the sample was too imprecise—or more simply, that the Medicare contractor did not use a large enough sample. But as the Medicare Appeals Council recognized, demanding a larger sample to

marginally increase the precision of an estimate "ignore[s] real world constraints imposed by conflicting demands on limited public funds, constraints which CMS chose to incorporate into the statistical sampling guidelines." The extrapolation methodology may be imperfect, but it is the product of a complex balance of interests. At a minimum, it constitutes substantial evidence in support of the agency's decision. *Cf. Maxmed*, 860 F.3d at 343 ("Congress clearly envisioned extrapolation in overpayment determinations involving home health agencies like [the plaintiff], and the Secretary's reliance on extrapolation as a tool was justified."). If anything, the extrapolation methodology is provider friendly. The extrapolation does not assume that the average overpayment in the random sample occurred for the universe of claims. Rather, the agency assumes that the average overpayment for all claims is equal to a number that there is a 90% chance is *smaller* than the actual overpayment. *See* MEDICARE PROGRAM INTEGRITY MANUAL § 8.4.5.1 (explaining that the agency uses the lower limit of a 90% confidence interval as its overpayment estimate). That means that there is a 90% probability that the amount that Palm Valley was overpaid is greater than the approximately $12 million that the contractor initially calculated. *See id.* ("[I]t yields a demand amount for recovery that is very likely less than the true amount of overpayment . . . ."); *see also* JAN KMENTA, ELEMENTS OF ECONOMETRICS 188−89 (2d ed. 1997) (demonstrating the properties of confidence intervals).

We see no error in the extrapolation.

\* \* \*

The judgment is AFFIRMED.