# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 12, 2019

No. 17-40897

Lyle W. Cayce
Clerk

ZILLE SHAH, Medical Doctor; ZILLE HUMA ZAIM, Medical Doctor, Physicians Assistant,

Plaintiffs - Appellants

v.

ALEX M. AZAR, II, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,

Defendant - Appellee

Consolidated With 17-40898

MOHAMMAD NAWAZ, Medical Doctor; MOHAMMAD ZAIM, Medical Doctor, Physicians Assistant,

Plaintiffs - Appellants

v.

ALEX M. AZAR, II, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,

Defendant - Appellee

Appeals from the United States District Court
for the Eastern District of Texas

No. 17-40897 c/w 17-40898

Before HIGGINBOTHAM, DENNIS, and COSTA, Circuit Judges.

PATRICK E. HIGGINBOTHAM, CIRCUIT JUDGE:

These consolidated appeals concern the revocation of two physicians' Medicare privileges. Physicians Mohammad Nawaz and Zille Shah are married. They submitted Medicare claims for services provided on dates that they were out of the country and the Centers for Medicare and Medicaid Services ("CMS") revoked their billing privileges. The district court considered the two cases together and affirmed the revocation decisions of the Secretary. We consolidated their appeals and now affirm.

I.

Mohammad Nawaz is a Texas-based cardiologist and Zille Shah is a Texas-based primary care physician.[1] Both doctors participated in the Medicare program until the revocation of their Medicare privileges. The events that precipitated the revocation of privileges are straightforward. The physicians concede that they were both out of the country during the following periods: June 18–20, 2011; September 27–October 2, 2011; May 2–4, 2012; and May 20–June 4, 2013. During that time, Nawaz submitted over 100 claims for reimbursement at the physician billing rate for medical services using his unique Medicare National Provider Identifier ("NPI") and Shah submitted over ninety Medicare claims for reimbursement at the physician billing rate using her unique NPI.

CMS administers the Medicare reimbursement program, including Medicare Part B, which covers medically necessary preventative services and supplies.[2] CMS contracts with a private firm, Novitas Solutions ("Novitas") to

---

[1] Nawaz practices under the Professional Association Mohammad Zaim, M.D., P.A. and Shah practices under the Professional Association Zille Huma Zaim, M.D., P.A.

[2] *See generally What Part B Covers*, Medicare.gov, *available at* https://www.medicare.gov/what-medicare-covers/part-b/what-medicare-part-b-covers.html.

provide administrative services. On September 25, 2014, Novitas contacted Nawaz and informed him that his Medicare privileges were being revoked because he had submitted "in excess of one hundred Medicare claims during documented periods of travel outside the United States." The letter informed Nawaz that the revocation was effective October 25, 2014 and notified him of his right to submit a Corrective Action Plan ("CAP") within 30 calendar days if he believed he was "able to correct the deficiencies and establish [his] eligibility to participate in the Medicare program." Shah received a similar letter on September 30, 2014, identifying over ninety submitted claims for services performed while Shah was out of the country; informing her that her Medicare privileges would be revoked effective October 30, 2014; and inviting her to submit a CAP providing evidence of compliance. The letters informed the physicians that their Medicare privileges were being revoked pursuant to 42 C.F.R. § 424.535(a)(8), the regulation defining "Abuse of Billing Privileges." The physicians were informed that Novitas was establishing a re-enrollment bar for a period of three years pursuant to 42 C.F.R. § 424.535(c).

The physicians each submitted a CAP. In his CAP, Nawaz conceded that the claims at issue were for services performed by nurse practitioners while he was out of the country.[3] He stated that he was "unaware that services for a nurse practitioner could not be billed under [his] NPI number unless [he] was physically present with them at all times." For her part, Shah explained in her CAP that she had "hired experts to guide [her] through the process of correcting billing errors" and "discontinued the use of nurse practitioners altogether." CMS, through Novitas, acknowledged receipt of both CAPs but determined that it would not overturn the initial revocations. CMS

---

[3] He continued, acknowledging that "[t]he billing for Nurse practitioners using [his] NPI number was in error, however, this was not done knowingly with the intent to defraud Medicare."

3

No. 17-40897 c/w 17-40898

acknowledged that the CAPS gave an "explanation of the circumstances" but did not "negate the fact that claims were submitted for services that could not have been furnished by [either physician] on the dates of service reported." Without verifiable evidence of compliance with the regulations at the time of the revocation, CMS maintained that the CAPs "must be denied." CMS then denied the physicians' requests for reconsideration.

Then began the administrative review process. The physicians sought review of CMS's decision to revoke their privileges before an ALJ. Across both proceedings, CMS and the physicians filed cross-motions for summary judgment and CMS prevailed before the ALJ. In both decisions, the ALJ noted that the physicians did not deny that they were out of the country on dates on which they submitted claims for services they allegedly provided. The ALJ determined that "concession is all that CMS needs in order to authorize revocation of [the physicians'] participation" in the Medicare program. Both Nawaz and Shah then appealed the adverse determinations to HHS's Departmental Appeals Board ("DAB"). The DAB affirmed each decision after oral argument, noting that the uncontested facts showed that each physician had been outside of the country while using personal NPI numbers to bill Medicare. Nawaz and Shah then sought review by the district court under 42 U.S.C. § 405(g). After briefing and oral argument, the district court issued a consolidated decision affirming CMS's revocation of the physicians' Medicare privileges. Both physicians timely appealed.

II.

The parties dispute the proper standard of review. The Secretary contends that this case is governed by 42 U.S.C. § 405(g), which the Medicare statute specifically incorporates.[4] Section 405(g) confines the inquiry to "(1)

[4] 42 U.S.C. § 1395cc(h).

No. 17-40897 c/w 17-40898

whether the Secretary applied the proper legal standards; and (2) whether the Secretary's decision is supported by substantial evidence on the record as a whole."[5] The physicians contend that the APA provides the applicable standard of review of the Secretary's decision, pointing to 5 U.S.C. § 706 which provides that the reviewing court shall set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[6] As in this court's decisions in *Maxmed Healthcare* and *Baylor County Hospital*, "[b]ecause the standard of review 'probably makes no difference'" we will "'assume only for the sake of argument that the APA's arbitrary and capricious standard applies.'"[7]

## III.

The physicians' interpretation of the relevant regulations lies at the heart of their appeal. The physicians contend that billing for services incident to the service of a physician does not require "the personal, on-site presence of the billing physician" and allows direct supervision to be provided by an "other practitioner." They argue that the ALJ and DAB misread the regulations because the regulatory scheme "recognizes that the billing physician may make arrangements with an other practitioner." They maintain that the claims at issue did not violate the regulations because the services were actually rendered, those services were performed by nurse practitioners acting under

---

[5] *Maxmed Healthcare, Inc. v. Price*, 860 F.3d 335, 340 (5th Cir. 2017) (quoting *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2006) (holding that because the Medicare Act incorporates § 405(g), the substantial evidence standard controls) (internal alterations and quotation marks omitted)).

[6] 5 U.S.C. § 706(2)(A). The physicians concede that, with respect to findings of fact, the standard of review is the same because the APA provides for substantial evidence review. § 706(2)(E).

[7] *Maxmed Healthcare*, 860 F.3d at 340 (quoting *Baylor Cty. Hosp. Dist. v. Price*, 850 F.3d 257, 261 (5th Cir. 2017)).

the physicians' orders after their initial evaluations, and they were performed "with covering [physicians] available."

Medicare Part B covers certain kinds of medically necessary and preventive services.[8] One category of covered services consists of those provided "*incident to a physician's professional service*, of kinds which are commonly furnished in physicians' offices and are commonly either rendered without charge or included in the physicians' bills."[9] These services are often provided by non-physician practitioners such as nurse practitioners or physician assistants. In this case, in fact, they were provided by nurse practitioners on the dates during which Nawaz and Shah were out of the country.

In order to fit within this category of "incident to" services, however, a variety of requirements must be met, which CMS outlines in its published regulations. At issue here is the requirement that services or supplies be furnished "under the *direct supervision* of the physician."[10] The governing regulation establishing this requirement, as it read at the time of the physicians' conduct in this case, explained the following:

> (b) Medicare Part B pays for services and supplies incident to the service of a physician (or other practitioner).
>
> . . .
>
> (5) Services and supplies *must be furnished under the direct supervision of the physician (or other practitioner)*. The physician (or other practitioner) directly supervising the auxiliary personnel need not be the same physician (or other practitioner) upon whose professional service the incident to service is based.[11]

---

[8] *See generally What Part B Covers*, Medicare.gov, *available at* https://www.medicare.gov/what-medicare-covers/part-b/what-medicare-part-b-covers.html.

[9] 42 U.S.C. § 1395x(s)(2)(A).

[10] 42 C.F.R. § 410.26(b)(5) (emphasis added).

[11] 42 C.F.R. § 410.26(b). As the Secretary points out in his brief, the physicians repeatedly quote the version of the regulations that are currently in effect rather than the version in effect at the time the subject services were provided. With the exception of the new argument physicians raised at oral argument with respect to "general supervision," *see infra*

No. 17-40897 c/w 17-40898

Thus, the physician "upon whose professional service the incident to service is based" (that is, the "ordering physician") need not be the same as the one providing direct supervision. In this case, Nawaz and Shah were the ordering physicians for all of the "incident to" procedures they billed to Medicare—they had established the treatment plans and ordered the services—while the nurse practitioners who performed the services were the "auxiliary personnel."[12]

The regulations in turn define "direct supervision" as follows[13]: "Direct supervision in the office setting means the physician *must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure.* It does not mean that the physician must be present in the room when the procedure is performed."[14] In other words, the regulations make clear that when Plan-B-eligible "incident to" services are furnished, a physician or other practitioner must be physically "present in the office suite" to directly supervise the services.

Each physician who participates in the Medicare program receives an NPI number.[15] When a member of the "auxiliary personnel" category (such as

note 19, the revisions do not affect the issue to be resolved in this case. Citations to the regulations throughout this opinion are to the version operative at the time the services were provided.

[12] 42 C.F.R. § 410.26(a)(1) defines auxiliary personnel to mean "any individual who is acting under the supervision of a physician (or other practitioner)." 42 C.F.R. § 410.26(a)(1). "Practitioner" is defined as "a non-physician practitioner who is authorized by the Act to receive payment for services incident to his or her own services." 42 C.F.R. § 410.26(a)(7).

[13] 42 C.F.R. § 410.26(a)(2) cross-references another section of the regulation for the definition, explaining that "[d]irect supervision means the level of supervision by the physician (or other practitioner) of auxiliary personnel as defined in § 410.32(b)(3)(ii)." 42 C.F.R. § 410.26(a)(2).

[14] 42 C.F.R. § 410.32(b)(3)(ii) (emphasis added).

[15] *See, e.g., Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius,* 901 F. Supp. 2d 19, 40 (D.D.C. 2012) ("The regulations implementing HIPAA adopted the National Provider Identifier ('NPI') as the universally recognized identifier.").

a physician assistant or nurse) described in 42 C.F.R. § 410.26(b)(5) provides "incident to" services and the ordering physician also directly supervises those services, the Medicare bill is made under that ordering physician's NPI number.[16] If no physician is present to directly supervise the auxiliary personnel, then the service must be billed under the NPI of the auxiliary personnel—this results in a reduction from a 100% billing rate for the medical service to an 85% billing rate.[17]

A separate regulation outlines the reasons for which CMS may revoke Medicare privileges. One such reason is for "[a]buse of [b]illing [p]rivileges," which the operative regulation defines to include situations in which:

> (i) The provider or supplier submits a claim or claims for services that could not have been furnished to a specific individual on the date of

---

[16] *See* 66 Fed. Reg. 55267 (Nov. 1, 2001) (in response to a comment expressing confusion about whose billing number should be used when billing for incident to services, the agency responded: "Inherent in the definition of an incident to service is the requirement that the incident to service be furnished incident to a professional service of a physician (or other practitioner). When a claim is submitted to Medicare under the billing number of a physician (or other practitioner) for an incident to service, the physician is stating that he or she either performed the service or directly supervised the auxiliary personnel performing the service. Accordingly, the Medicare billing number of the ordering physician (or other practitioner) should not be used if that person did not directly supervise the auxiliary personnel."); *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 911 (7th Cir. 2009) ("[A] health-care provider may use a doctor's identification number to bill Medicare and Medicaid for services performed by a physician's assistant—and thus obtain reimbursement at the doctor's rate—if the assistant rendered services 'incident to' the services of a physician. Most relevant for purposes of this case, an assistant's services are 'incident to' a physician's services *only if the doctor directly supervises the assistant's performance.*" (emphasis added)); *U.S. ex rel. Lockyer v. Haw. Pac. Health*, 490 F. Supp. 2d 1062, 1078 (D. Haw. 2007) ("The incident to rules prohibit billing for services under the provider number of a physician who was not present in the office at the time the alleged supervision took place.").

[17] *See United States v. R&F Props. of Lake Cty., Inc.*, 433 F.3d 1349, 1353 (11th Cir. 2011) ("Alternatively, a provider may bill Medicare for physician assistant and nurse practitioner services under the physician assistant's or nurse practitioner's own [NPI]. Billing Medicare in this second way indicates that the physician assistant or nurse practitioner has performed the service under some level of supervision by a physician, but the requirements of 42 CFR § 410.26 have not necessarily been met. For services billed under a physician assistant's or nurse practitioner's [NPI], the [fiscal intermediary] pays 85% of what it would pay for the same services billed under a physician's [NPI].").

service. These instances include but are not limited to the following situations:

> (A) Where the beneficiary is deceased.
> (B) *The directing physician or beneficiary is not in the state or country when services were furnished.*
> (C) When the equipment necessary for testing is not present where the testing is said to have occurred.[18]

In other words, the revocation regulation specifically contemplates the issue here: the physicians could not have provided direct supervision because they were not in the country when the services at issue were furnished.

The physicians reject the conclusion of the ALJ and DAB that direct supervision by the billing provider was required. It is not entirely clear if the physicians are suggesting that the nurse practitioners qualified as "other practitioners" or whether they contend that they had made arrangements for covering physicians who themselves provided direct supervision—or some hybrid of the two.[19]

---

[18] 42 C.F.R. § 424.535(a)(8)(i) (emphasis added).

[19] At oral argument, the physicians suggested a new theory regarding their compliance with 42 C.F.R. § 410.26(b)(5). They argued that the regulation contemplates different levels of physician supervision, and because the services at issue here were "chronic care management," "general supervision" was all that was required, not "direct supervision." physicians did not make this general supervision argument in any of the tribunals below or in their briefs before this court. New arguments or legal theories first raised at oral argument are waived, and we need not consider the merits of the argument. *Comsat Corp. v. F.C.C.*, 250 F.3d 931, 936 n.5 (5th Cir. 2001) (citing *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 270 (5th Cir. 1998)). We note briefly, however, that the physicians' argument relies on a new version of the regulation that was not in place when the services at issue here were provided. Section 410.26(b)(5) as written at the time the services were performed did not contemplate allowing a physician to bill for services "incident to the service of a physician" furnished under general supervision, rather it allowed only services provided under direct supervision. The regulation was amended in November 2014—after the services at issue here were provided—to allow "[s]ervices and supplies furnished incident to transitional care management and chronic care management services [to] be furnished under general supervision of the physician (or other practitioner) when these services or supplies are provided by the clinical staff." 79 Fed. Reg. 67548-01, 68002 (Nov. 13, 2014). The regulation at the time the services were provided did not allow services incident to the service of a physician to be furnished under general supervision, contrary to the new argument introduced by counsel to the physicians at oral argument.

No. 17-40897 c/w 17-40898

The Secretary does not dispute that the directing physician may make arrangements with another physician to provide or directly supervise "incident to" services. Indeed, the regulations are quite clear on this point. Here however, the physicians billed for the services using their own NPI numbers, which would have required them to be physically present in the office suite and providing direct supervision. Further, as discussed below, the physicians failed to provide competent evidence that they had arranged covering physicians who provided the requisite direct supervision. With respect to the nurse practitioners who provided the services, the physicians make no argument that they were "non-physician practitioner[s] who [are] authorized by the Act to receive payment for services incident to [their] own services."[20] Even if they did qualify as other practitioners for purposes of the regulation, they would have been required to bill under their own NPIs at a reduced rate of 85%, since no physician was supervising.[21] The physicians cannot escape the plain language of the regulation—they billed for services using their own NPIs without providing direct supervision while traveling outside of the country.[22]

IV.

The physicians also contend that the ALJ's summary judgment dismissal of their claims was not supported by substantial evidence. First, the physicians challenge the declaration of Matthew Kirk, a special agent for the Secretary's Office of Inspector General, submitted by CMS on summary judgment. They

---

[20] 42 C.F.R. § 410.26(a)(7).

[21] *See, e.g.*, *Landau v. Lucasti*, 680 F. Supp. 2d 659, 671 (D.N.J. 2010) ("Quite plainly, Medicare requires the physician's personal supervision, including physical presence, to bill at the physician services rate; otherwise, assuming the assistants or nurses administering the infusion therapy are qualified non-physician practitioners, the Medicare reimbursement can be sought only at the lower rate for such practitioners.").

[22] *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1222 (2015) ("[W]e should assume that the ordinary meaning of the regulation's language expresses its purpose and enforce it according to its terms.") (internal alterations and quotation marks omitted).

argue that Kirk's declaration was unreliable and that it contained hearsay evidence and false assertions. The physicians also aver that they presented sufficient proof—in the form of their own affidavits—to create a material issue of fact as to whether they had secured covering physicians when they were out of the country.

The physicians' challenge to CMS's evidence focuses entirely on the Kirk declaration. The physicians fail to give any explanation for their contention that the declaration is hearsay, but the challenge fails for a simpler reason: the ALJ specifically disclaimed reliance on the affidavit in reaching his conclusion. The ALJ explained with respect to Nawaz:

> Petitioner asserts—without explanation—that the declaration of Matthew Kirk is not credible. I need not address that argument in order to issue summary judgment favorable to CMS because CMS does not rely on anything in the affidavit to establish facts that are in dispute. As I have explained, Petitioner admits that he was out of the country during periods of time when he claimed reimbursement for services that he ostensibly provided to Medicare beneficiaries.

The ALJ offered the same explanation to an identical challenge to Kirk's declaration raised by Shah. The ALJ relied instead on the physicians' own admissions that they were out of the country when the services at issue were performed and nonetheless billed for the services using their own NPI numbers. Under CMS's reasonable interpretation of the governing regulation outlined above, the ALJ's decision was supported by substantial evidence.

The physicians' claims about the evidentiary value of their own affidavits also fail. In their affidavits submitted to the ALJ, the physicians assert that they had arranged coverage by other physicians while they were out of the

country.[23]   As a preliminary matter, the DAB found that the affidavits submitted by the physicians did not establish that the physicians arranged for other cardiologists or primary care providers to furnish the direct supervision required by CMS regulations. The DAB noted that the vague statements provided—that Nawaz had two cardiologists "covering for [him]" and that Shah had "lined up primary care providers for coverage in case of emergency"—do not establish direct supervision. The suggestion that the physicians submitted evidence of covering physicians providing direct supervision is further undercut by other statements in the record. For example, Nawaz argued that "CMS has no evidence to suggest that this necessity arose" and that "[n]o other cardiologists are willing or able . . . to tend to Medicare beneficiaries in nursing homes." The physicians failed to satisfy their burden of identifying "specific evidence in the summary judgment record demonstrating that there is a material fact issue" concerning whether they had arranged for covering physicians to provide direct supervision.[24] Even if the physicians had pointed to specific evidence that covering physicians had provided direct supervision, it is undisputed that the physicians billed using their own NPI numbers while out of the country. As explained above, the regulatory scheme precludes that method of billing, even if covering physicians are used.

## V.

The physicians also raise a host of constitutional challenges. First, they contend that their due process rights were violated by the ALJ's decision to

---

[23] Nawaz asserted: "Also, I had 2 cardiologists . . . covering for me on the above dates as well as the medical director at each facility." Similarly, Shah stated: "On the three day trips, my husband lined up a nurse practitioner from his separate practice to assist me and I lined up primary care providers for coverage in the case of an emergency if the nurse practitioner or the facility needed emergent intervention from the primary care providers for my patients."

[24] *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994) ("[U]nsubstantiated assertions are not competent summary judgment evidence.").

grant the Secretary's summary judgment motions without an oral hearing. Next, the physicians argue CMS violated their due process rights by failing to consider the physicians' corrective action plans and reverse the revocation decision in light of those CAPs. Finally, the physicians claim that CMS's revocation decisions amounted to an unconstitutional taking without compensation.

The physicians' contention that their due process rights were violated by the ALJ's decision to grant summary judgment for CMS without an oral hearing retreads the substantial evidence challenge disposed of above. They concede that an ALJ is empowered to dispose of a claim on summary judgment, but argue that here, CMS failed to meet its burden of demonstrating that there were no genuine issues of material fact—again pointing to the fact that the services were actually rendered and the evidentiary flaws with Kirk's declaration. The physicians argue that they would have fleshed out the "necessary details of the 'coverage'" that they secured during their travels if the ALJ had granted them an oral hearing. At base, the physicians' contention regarding their entitlement to an oral hearing is an attack of the wisdom of the ALJ's decisions, not the constitutionality of the procedure. As the physicians concede, it is well-established that an ALJ is empowered to decide a case on a motion for summary judgment without an evidentiary hearing.[25] As explained above, the physicians failed to present competent evidence of a covering physician to create a genuine issue of material fact; they have demonstrated

---

[25] *Cedar Lake Nursing Home v. U.S. Dep't of Health and Human Servs.*, 619 F.3d 453, 457 (5th Cir. 2010) ("Judge Posner noted that giving heightened deference to administrative decisions is appropriate, even on appeal from summary judgment, because agencies have particular subject-matter experience and expertise and 'are given more decisional latitude by legislatures than trial courts are . . . .' This holding is consistent with opinions of other circuit courts concerning judicial review of decisions made without evidentiary hearings by agencies other than the DHHS. We find Judge Posner's reasoning . . . persuasive." (internal citations omitted)).

no constitutional violation stemming from the Kirk declaration, on which the ALJ and DAB disclaimed reliance; and their insistence that the services were actually provided by nurses is beside the point given the plain language of the regulations.

The physicians also object to CMS's "categorical refusal" to consider their CAPs, contending that their failure to consider the plans violated their due process rights. Reviewing the determinations of Novitas, CMS's contractor, the physicians overstate their claim. CMS did not "categorical[ly] refus[e]" to consider the CAPs, but rather informed the physicians that

> Based on our evaluation of the information provided in your CAP, we have determined you have not provided verifiable evidence you were in compliance with Medicare requirements at the time revocation was issued; therefore, we are not overturning our initial decision.

The letters go on to consider the content of the CAPs, finding that although the CAPs gave an explanation for the circumstances, they did not demonstrate compliance with the regulations. Further, plaintiffs offer no support for their contention that CMS's failure to accept a CAP constitutes a due process violation. To the contrary, the regulations explicitly grant CMS or its contractor the authority to review a CAP and the discretion to either (1) reinstate the provider's billing privileges if the provider has supplied "sufficient evidence to CMS or its contractor that it has complied fully with the Medicare requirements" or (2) "refuse[] to reinstate a provider or supplier's billing privileges."[26] The regulations provide that "[t]he refusal of CMS or its contractor to reinstate a provider or supplier's billing privileges based on a corrective action plan is not an initial determination. . ." and is therefore not

---

[26] 42 C.F.R. § 405.809(b).

appealable.[27] Because the regulations made clear that the agency's decision not to reinstate billing privileges after reviewing a CAP is not an appealable "initial determination," and the physicians cite no authority to the contrary or explain how the agency's refusal violated their right to due process, their constitutional claim fails.[28]

Finally, the physicians assert that they had "an established property right in possessing and utilizing a Medicare provider number." Therefore, the physicians claim, CMS's revocation decision amounted to an unconstitutional taking without compensation. The Secretary argues that the physicians cannot show entitlement to continued participation in the Medicare program. "A property interest requires 'more than a unilateral expectation' of a benefit.' Instead, a person must 'have a legitimate claim of entitlement to it.'"[29] While this court has not directly addressed whether a healthcare provider has a property interest in being a provider in federal health care programs, a number of other circuits have determined that a provider does not have such a protected interest.[30] Because health care providers "are not the intended

---

[27] *Id.*; 42 C.F.R. § 498.3(d) ("Administrative actions that are not initial determinations (and therefore not subject to appeal under this part) include but are not limited to the following: . . . (5) The determination not to reinstate a suspended or excluded practitioner, provider, or supplier because the reason for the suspension or exclusion has not been removed, or there is insufficient assurance that the reason will not recur.")

[28] *See, e.g.*, *Comm. Mental Health Care of Alexandria v. SSA*, 86 Fed App'x 777, 777–78 (5th Cir. 2004) (per curiam).

[29] *Personal Care Prods., Inc. v. Hawkins*, 635 F.3d 155, 158 (5th Cir. 2011) (holding that a Medicaid provider did not have a property right in its Medicaid reimbursements withheld pending a fraud investigation) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)).

[30] *Parrino v. Price*, 869 F.3d 392, 397–98 (6th Cir. 2017) (collecting cases). Although the Fourth Circuit has reached a contrary conclusion, holding that a physician's "expectation of continued participation in the [M]edicare program is a property interest protected by the due process clause of the fifth amendment," *Ram v. Heckler*, 792 F.2d 444, 447 (4th Cir. 1986), four circuits have explicitly rejected that conclusion. *Parrino*, 869 F.3d at 398 ("And though the Fourth Circuit has declared that providers do have a property interest in continued participation in federal health care programs, it provided no accompanying analysis for its conclusion. We find persuasive the rationale of the First, Ninth, and Tenth Circuits in finding

No. 17-40897 c/w 17-40898

beneficiaries of the federal health care programs . . . they therefore do not have a property interest in continued participation or reimbursement."[31] While the physicians may be correct that they lost a considerable amount of money in reimbursable services because of their inability to participate in Medicare for three years, the income losses do not rise to the level of a protected property interest because "no clear promises have been made by the Government" that would create a legitimate claim of entitlement.[32] We agree with our four other sister circuits that have determined participation in the federal Medicare reimbursement program is not a property interest.

## VI.

Finally, the physicians take aim at CMS's decision to bar them from re-enrolling in the Medicare program for three years. They maintain that this punishment was disproportionate to their violations, and therefore should be reversed as arbitrary. The physicians emphasize that all services billed for were in fact rendered to the patients and contend that the violation of the direct supervision requirement and use of the incorrect billing numbers does not justify the "draconian punishment" imposed here. To highlight the alleged disproportionality, they point to the small dollar amount of actual overbilling that occurred by billing at the physician rates as opposed to the nurse practitioner rates—$1,500 in the case of Nawaz and $900 in the case of Shah.

The physicians' argument fails to grapple with the simple fact that the governing regulation specifically contemplates a re-enrollment bar between

---

no property interest." (internal citation omitted); *Erickson v. U.S. ex rel. Dep't of Health & Human Servs.*, 67 F.3d 858, 862 (9th Cir. 1995) ("We do not find *Ram* to be persuasive authority for plaintiffs' position. In contrast, the First and Tenth Circuits have provided reasoned analyses for their conclusion that physicians do not have a property interest in continued participation in Medicare."); *Koerpel v. Heckler*, 797 F.2d 858, 863–65 (10th Cir. 1986); *Cervoni v. Sec'y of Health, Ed. & Welfare*, 581 F.2d 1010, 1018–19 (1st Cir. 1978).

[31] *Parrino*, 869 F.3d at 398.

[32] *Koerpel*, 797 F.2d at 864.

one and three years.[33] CMS's decision to impose a three-year bar fell within its express regulatory authority. The regulation gives CMS the discretion to impose a ban between one and three years, "depending on the severity of the basis for revocation."[34] "[W]here Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy the relation of remedy to policy is peculiarly a matter for administrative competence."[35] "The sanction may be overturned only if it is 'unwarranted in law or without justification in fact.'"[36] The physicians offer no support for their suggestion that the severity of the violation should be measured by the dollar amount of the windfall enjoyed by the physicians. The Secretary points to another measure of severity—the large number of erroneous claims submitted by the physicians: over 90 for Shah and 100 for Nawaz. As the ALJ noted, the provision at issue here is "not an anti-fraud regulation so much as it is intended to allow CMS to disassociate itself from providers and suppliers who are not rigorous in assuring that their claims are accurate." The physicians here evinced a pattern of submitting inaccurate claims. Because the agency's decision to impose a re-enrollment ban at the high end of the enumerated range was neither unwarranted in law or without factual justification, we defer to the agency's assessment of the appropriate sanction.[37]

---

[33] 42 C.F.R. § 424.535(c). After a revocation of billing privileges, a provider is "barred from participating in the Medicare program . . . [for] a minimum of 1 year, but not greater than 3 years, depending on the severity of the basis for revocation."

[34] *Id.*

[35] *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185 (1973) (internal citation and quotation marks omitted).

[36] *Knapp v. U.S. Dep't of Agric.*, 796 F.3d 445, 455 (5th Cir. 2015) (quoting *Butz*, 411 U.S. at 186)).

[37] *See Escobar v. U.S. Dep't of Agric.*, 68 F.3d 466, 466 (5th Cir. 1995) (per curiam). The cases cited by the physicians do not teach otherwise. In *Commc'ns. and Control, Inc. v. FCC*, the D.C. Circuit deemed the FCC's harsh treatment of a typographical error arbitrary and capricious because it marked a stark departure from its previous practice "of correcting, without much ado, [such] typographical errors" without any explanation. 374 F.3d 1329, 1335 (D.C. Cir. 2004). In *In re Bell Petroleum Servs.*, this Court reversed an EPA penalty as

No. 17-40897 c/w 17-40898

VII.

For the foregoing reasons, we affirm the decision of the district court.

---

arbitrary and capricious because it forced a party to bear the entire cost of an expensive system that the court concluded was illogically implemented. 3 F.3d 889, 906 (5th Cir. 1993) ("[O]n the basis of the administrative record, it appears that the AWS did not even reduce, much less eliminate, any public health threat. No technical expertise is necessary to discern that the EPA's implementation of the AWS was arbitrary and capricious, as well as a waste of money."). In *Young v. Hampton*, an employment case, the Seventh Circuit examined the "unique circumstances" raised by an agency's refusal to reinstate a member of the civil service for conduct off the clock, in the face of "uncontradicted credible evidence that his misconduct had no detrimental effect on the efficiency of the service." 568 F.2d 1253, 1266 (7th Cir. 1977). None of these decisions, nor any of the others cited by the physicians, address an agency's decision to issue a penalty specifically authorized by its regulations for conduct that the regulation made clear was prohibited.